Martin N. Flics
Paul S. Hessler
**LINKLATERS LLP**
1345 Avenue of the Americas
New York, NY 10105
(+1) 212 903 9000 (Tel)
(+1) 212 903 9100 (Fax)

*Attorneys For DISH Network Corporation*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | Chapter 11 |
| DBSB NORTH AMERICA, INC., *et al.*,[1] | Jointly Administered |
| Debtors. | Case No. 09-13061 (REG) |
| DISH NETWORK CORPORATION, | |
| Appellant, | |
| v. | 09 Civ. 10372 (LAK), |
| | 09 Civ. 10373 (LAK) |
| DBSD NORTH AMERICA, INC., *et al.*, | |
| Appellees. | |

## MOTION OF DISH NETWORK CORPORATION FOR LIMITED STAY

       DISH Network Corporation ("**DISH**"), through its undersigned counsel, files this

Motion for Limited Stay (the "**Motion**") pursuant to Rule 8017 of the Federal Rules of

Bankruptcy Procedure and Rule 8 of the Federal Rules of Appellate Procedure.

---

[1]     The Debtors in these chapter 11 cases are: DBSD North America, Inc.; 3421554 Canada Inc.; DBSD Satellite Management, LLC; DBSD Satellite North America Limited; DBSD Satellite Services G.P.; DBSD Satellite Services Limited; New DBSD Satellite Services G.P.; and SSG UK Limited.

## INTRODUCTION

On March 24, 2010, the Court entered its Memorandum and Order (the "**District Court Order**") affirming the two orders of the Bankruptcy Court that were the subject of this appeal.  DISH has filed notices of appeal appealing this Court's decision, and files this motion for a limited stay to preserve its appellate rights.  DISH requests that, in the event the Federal Communications Commission (the "**FCC**") approves the license transfers contemplated by the Debtors' plan of reorganization (the "**Plan**") the Debtors be stayed from taking any further action to consummate the Plan for a period of 14 days.

DISH requests this limited relief in order to prevent the risk that it will suffer irreparable harm through loss of its appellate rights.  FCC approval of the Debtors' transfer of control applications is the only remaining condition to consummation of the Plan. Although it is uncertain when the FCC will complete its review of the Debtors' transfer of control application, it is possible that the FCC will do so before DISH's appeals can be resolved.  In order to prevent the forfeiture of appellate rights should consummation of the Plan be found to moot DISH's appeal, a limited stay is appropriate and necessary.

The Appellees will suffer no harm if the requested relief is granted.  This Motion requests relief that is carefully tailored to enable DISH to protect its appellate rights, while minimizing any harm to the Debtors.  The limited stay would come into effect only upon satisfaction (or waiver) of all conditions precedent to the effective date of the Plan, other than closing of their exit financing, and then only if an appeal has not been concluded, thereby avoiding prejudice to any other party to this case.

### BASIS FOR RELIEF REQUESTED

Rule 8017 of the Federal Rules of Bankruptcy Procedure provides that an order entered by the District Court in a bankruptcy appeal is stayed for 14 days, but that the District

Court may grant a further stay pending appeal to the Court of Appeals.  Rule 8 of the Federal

Rules of Appellate Procedure provides that a request for a stay pending appeal to a Court of

Appeals must ordinarily be brought in the District Court.  The District Court considers four

factors in deciding whether to exercise its discretion to grant a stay of an order pending appeal:

"(1) whether the movant will suffer irreparable injury absent a stay, (2) whether a party will

suffer substantial injury if a stay is issued, (3) whether the movant has demonstrated a substantial

possibility, although less than a likelihood, of success on appeal, and (4) the public interests that

may be affected."  In re Adelphia Commc'ns Corp., 361 B.R. 337, 346 (S.D.N.Y. 2007) (quoting

Hirschfeld v. Bd. of Elections in N.Y., 984 F.2d 35, 39 (2d Cir. 1993)).  The party seeking a stay

need not establish all four factors; rather "the Second Circuit has consistently treated the inquiry

of whether to grant a stay pending appeal as a balancing of factors that must be weighed."  Id. at

347.  Here, each of the four factors weighs in favor of granting the requested limited stay.

1.    **DISH Faces A Substantial Risk of Irreparable Harm If The Limited Stay Is Not Granted.**

        In the absence of a stay, there is a risk that DISH will lose its appellate rights as a

result of substantial consummation of the Plan.  Once a reorganization plan has been

substantially consummated, any appeal of the plan is presumed to be equitably moot.  Adelphia,

361 B.R. at 347, citing Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94

F.3d 772, 776 (2d Cir. 1996).  Although the presumption of equitable mootness may be

rebutted,[2] "[t]he strong possibility of mootness based on substantial consummation of a

---

[2]    The presumption of equitable mootness can be rebutted upon a showing that: (a) the court can still order some effective relief; (b) such relief will not affect "the re-emergence of the debtor as a revitalized corporate entity;" (c) such relief will not unravel intricate transactions so as to "knock the props out from under the authorization for every transaction that has taken place" and "create an unmanageable, uncontrollable situation for the Bankruptcy Court;" (d) the "parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings;" and (e) the appellant "pursued with diligence all available remedies to obtain a stay of execution of the objectionable

bankruptcy plan means that absent a stay of an order confirming a plan of reorganization pending appeal, many bankruptcy court confirmation orders will be immunized from appellate review…" Id. at 349. If DISH's appeal were found to be equitably moot,[3] DISH would be unable to obtain *any* relief, regardless of the merits of its appeal. The risk that DISH may lose its ability to obtain any appellate relief constitutes irreparable harm. Adelphia, 361 B.R. at 348. ("[L]oss of appellate rights is a 'quintissential form of prejudice.' Thus, where the denial of a stay pending appeal risks mooting any appeal of *significant* claims of error, the irreparable harm requirement is satisfied.") (quoting In re Country Squire Assocs. of Carle Place, L.P., 203 B.R. 182, 183 (2d Cir. B.A.P. 1996) (emphasis in original)); see also In re St. Johnsbury Trucking Co., 185 B.R. 687, 690 (S.D.N.Y. 1995) (finding sufficient irreparable injury where denying a stay would threaten government's ability to appeal a bankruptcy court's decision); In re Advanced Mining Sys., Inc., 173 B.R. 467, 468-69 (S.D.N.Y. 1994) (finding irreparable injury where, absent a stay of the bankruptcy court's order, the distribution of assets to creditors would moot any appeal).

### 2. The Limited Stay Will Not Cause Substantial Injury to Any Party In Interest.

No party in interest will suffer substantial harm in the event a stay is granted. Courts interpret this factor to require an inquiry into whether the balance of harms tips in favor of granting the stay. Adelphia, 361 B.R. at 349. In this case, appellants risk losing all appellate rights if a stay is not granted. In contrast, neither the Debtors nor any other party in interest will suffer any harm, much less substantial harm, from the grant of this very limited stay.

---

order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from." Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.), 10 F.3d 944, 952-53 (2d Cir. 1993).

[3]  DISH does not concede that, in the event the requested limited stay is not granted and the Plan is substantially consummated prior to DISH's appeal being heard, DISH's appeal would in fact be equitably moot. DISH preserves its right to argue that, under those circumstances, the presumption of equitable mootness would be rebutted by a showing of the five factors set forth in In re Chateaugay Corp., 10 F.3d at 952-53.

The Bankruptcy Court addressed this issue when it granted appellants similar relief pending their appeal to this Court, and found no harm to any party in interest in granting the modest stay requested by appellants. Because consummation of the Plan was projected to take months even absent a stay, the Bankruptcy Court reasoned that a limited stay of 14 additional days could not be considered a substantial harm. See Nov. 20, 2009 Hr'g Tr., at 25:7-9 ("But I cannot, for the life of me, see how giving Sprint ten days at the end of a period that's likely to last four months is a big deal."). This reasoning is equally applicable now. Having waited four months for FCC approval, and possibly having to wait another two months or more, the Appellees cannot be harmed by a short additional delay if or when FCC approval is obtained.

### 3. DISH Has More Than A "Mere Possibility" Of Success On Appeal

The necessary level or degree of possibility of success will vary according to the court's assessment of the other stay factors. In re Adelphia Commc'ns Corp., 361 B.R. at 349. The party seeking a stay does not need to show a probability of success on the merits; instead, where a "serious legal question" is involved, the movant "need only present a substantial case on the merits." Id. A substantial case on the merits is shown where there is more than a "mere possibility" of a successful appeal. Country Squire, 203 B.R. at 184; Hirschfeld, 984 F.2d at 39. The standard is an "intermediate level between possible and probable which is intended to eliminate frivolous appeals." Country Squire, 203 B.R. at 184.

Although this Court affirmed the Bankruptcy Court, DISH's appeal involves multiple serious legal questions and presents a substantial case on the merits. The issues presented by DISH's appeal raise legal questions which warranted days of testimony and argument and two lengthy opinions from the Bankruptcy Court. Because DISH has fully briefed the issues before this Court and this Court recently considered them, we do not repeat DISH's

full legal arguments here but confine ourselves to a discussion of why those issues present serious legal questions.

First, the Bankruptcy Court's designation of DISH's vote departs significantly from previous cases discussing designation. Because a creditor's right to vote is among its most "sacred" rights, designation has long been understood to be an exceptional remedy that would result only from "highly egregious conduct." In re Adelphia Commc'ns Corp., 359 B.R. 54, 56, 61 (Bankr. S.D.N.Y. 2006). Prior to the Bankruptcy Court's decision, courts have designated votes only where the creditor's conduct sought favorable treatment for the creditor or resulted in the unequal treatment of creditors in the same class. In re Allegheny Int'l, Inc., 118 B.R. 282 (Bankr. W.D. Pa. 1990). The Bankruptcy Court's designation of DISH's vote absent any showing of egregious conduct represents a significant expansion of the designation doctrine. See Id.; In re Dune Deck Owners Corp., 175 B.R. 839, 844-45 (Bankr. S.D.N.Y. 1995). Indeed, the decision has attracted significant commentary among bankruptcy practitioners noting that the case breaks new ground and threatens what had been widely viewed as acceptable creditor conduct. See, e.g., ABA Section of Business Law Spring Meeting, Bankruptcy Committee, Task Force On Current Developments In Bankruptcy Law, at 47 ("[The] DBSD [decision] espouses a principle it asserts it takes from Allegheny, but is actually unsubstantiated by Allegheny or any prior decision, namely that the motive to take control alone warrants the designation of votes: . . . DBSD overlooks the absence of any fact showing that DISH caused itself to be favored, or different creditors in the same class to be treated differently, as [the creditor] did in Allegheny.")[4]; see also Evan M. Jones & Jennifer Taylor, Bankruptcy Court Decision Raises Question on Acquisition of Claims in Order to Acquire Debtor, (Feb. 4, 2010), available at

---

[4]     We attach relevant portions of this article as Exhibit A.

http://www.omm.com/newsroom/publication.aspx?pub=933 ("Facts similar to those presented in

DBSD have been held insufficient to warrant designation where the court has required evidence

of wrongdoing. . . . In DBSD, however, the bankruptcy court designated DISH's vote on the

basis of DISH's motivation to engage in a strategic transaction with the Debtors and seemingly

without additional evidence of wrongdoing. In the event that DBSD represents a departure from

the wrongdoing requirement, the decision may have implications for the plan votes of creditors

beyond simply those looking to acquire a debtor.").

     The designation issue presents the additional legal question, which the

Bankruptcy Court itself acknowledged to be one of first impression, of the appropriate remedy

for vote designation.  In holding DISH to be an "accepting" class as a result of its vote being

designated, the Bankruptcy Court fashioned an additional "remedy" for the designation that is

not contemplated by, and contradicts, the plain language of the Bankruptcy Code, and in doing

so relied on inapposite caselaw.  Indeed, never before has a creditor who actively participated in

and opposed a Plan been deemed to have accepted it.  Investment, whether strategic or otherwise,

is at the heart of modern bankruptcy practice. The Bankruptcy Court's designation decisions

break new ground, presenting serious legal questions of consequence to the bankruptcy bar as a

whole. See Evan M. Jones & Jennifer M. Taylor, Bad Bankruptcy Citizen, The Deal Magazine

(Apr. 2, 2010), available at http://www.thedeal.com/newsweekly/community/judgment-call/bad-

bankruptcy-citizen.php) ("Buying claims against a company that is in, or imminently headed for,

bankruptcy has become over the past few years a popular method of acquiring the company in

what is known as a loan-to-own transaction. However, a recent case from the Manhattan

bankruptcy court indicates a strong hostility to such a strategy and, if followed by other courts,

may threaten its viability.").

DISH's appeal also raises serious questions as to whether section 1129(b) of the Bankruptcy Code can be legally satisfied where a crammed down rate of interest materially and significantly differs from undisputed, contemporaneous evidence that the Debtor presently can obtain financing only by paying a significantly higher rate of interest. The Second Circuit articulated the exacting "indubitable equivalent" standard pursuant to which the Debtors sought to cram down its Plan over DISH's objection, requiring that a creditor deprived of its collateral (as DISH was here) be compensated by "a substitute of the most indubitable equivalence." Metro. Life Ins. Co. v. Murel Holding Corp. (In re Murel Holding Corp.), 75 F.2d 941, 942 (2d Cir. 1935). Contrary to this "exacting" standard, the Bankruptcy Court approved cramdown of DISH's first lien claim notwithstanding that it was replaced by a note with a sub-market rate of interest, that pays no principal or interest for four years, and that greatly increases the time horizon and risk of repayment of the loan by a borrower that has no operations, no revenue, and lacks the resources necessary to make the substantial improvements to its assets to render them capable of generating revenue (much less a profit). This stretches the meaning of indubitable equivalence to an extreme unsupported by any cases cited by the Debtors or the Bankruptcy Court.

DISH also presents significant legal questions regarding the feasibility of the Plan and whether the Bankruptcy Court applied the correct legal standard. It is settled that "[t]o establish feasibility, the debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan and maintain operations according to the plan. Such projections cannot be speculative, conjectural or unrealistic." Pan Am Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 508 (S.D.N.Y. 1994) (quotation omitted). Departing from that standard, the Bankruptcy Court held that the Plan was feasible based on highly speculative evidence. Indeed,

the only projections presented by the Debtors show no available cash to repay the $260 million in debt the Debtors will accrue during the four-year Plan period. It is undisputed that the Debtors will have to obtain either significant additional financing or a strategic partner in order to repay that debt (much less to fund its ongoing operations). The Bankruptcy Court improperly relied on conclusory opinions from the Debtors' experts that they would be able to obtain financing in the future, notwithstanding that those experts would not even opine on how much financing they believed the Debtors would be able to obtain. At a bare minimum, that pushes the concept of feasibility to an extreme; it presents a classic case in which the success of the Plan is both speculative and conjectural.

These issues present serious legal questions, establishing that DISH will present a substantial case on the merits of its appeal.

### 4.    A Limited Stay Favors The Public Interest.

The final factor to be considered by the court is whether the requested stay favors the public interest. See Country Squire, 203 B.R. at 184 ("The Supreme Court has stated that … 'bankruptcy courts are necessarily entrusted with broad equitable powers to balance the interests of the affected parties, guided by the overriding goal of ensuring the success of the reorganization.") (quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P., 507 U.S. 380, 389 (1993). In the context of an appeal of a confirmation order, the competing interests at stake are the expedient administration of the bankruptcy case on the one hand and the preservation of parties' appellate rights on the other. See Adelphia, 361 B.R. at 349. In this case the public interest in favor of expedient administration of the bankruptcy case carries no weight because the limited stay will not cause any material additional delay in consummation of the Plan. On the other hand, the preservation of appellate rights presents a compelling interest in this case, given

·the important legal questions and issue of first impression presented by DISH's appeal.

Accordingly, this factor weighs in favor of granting the limited stay.

     **5.**    **No Bond is Necessary.**

     A district court may impose a bond as a condition to imposing a stay pending

further appeal to a circuit court. Fed. R. Bankr. P. Rule 8017(b). Whether to do so is within the

court's discretion.  Courts look to whether a bond is necessary to protect "against diminution in

the value of property pending appeal" and to "secure the prevailing party against any loss that

might be sustained as a result of an ineffectual appeal." Adelphia, 361 B.R. at 350.

     A bond is not necessary in this case because no party in interest will suffer any

harm if the limited stay is granted. Although the appellees previously raised the possible harm of

the FCC not considering the pending applications if the Bankruptcy Court were to grant a limited

stay, there is no showing that the FCC process is in any way affected by whether or not the Court

grants a limited stay.  In any event, that concern is addressed by the proposed order, which states

that the relief granted constitutes a notice requirement. Accordingly, no bond is necessary.

**CONCLUSION**

     Wherefore, DISH respectfully requests that the Court grant the relief requested by

entering an order substantially in the form attached hereto as Exhibit B and by granting such

further relief as the Court deems just and appropriate.

Dated:    New York, New York          Respectfully submitted,
          April 16, 2010               Linklaters LLP


                                   By:    /s/ Paul S. Hessler
                                   Martin N. Flics
                                   Paul S. Hessler
                                   1345 Avenue of the Americas
                                   New York, NY 10105
                                   (212) 903-9000
                                   *Attorneys for DISH Network Corporation*

10

# EXHIBIT A

# ABA
# SECTION OF BUSINESS LAW
# SPRING MEETING
# APRIL 22 – 24, 2010
# BUSINESS BANKRUPTCY COMMITTEE
# TASK FORCE ON CURRENT
# DEVELOPMENTS IN BANKRUPTCY LAW

## PRESENTERS

**Martin J. Bienenstock**
Dewey & LeBeouf
1301 Avenue of the Americas
New York, NY  10019

**Michael R. Enright**
Robinson & Cole
One Commercial Plaza
Hartford, Connecticut  06103

**Judith W. Ross**
Baker Botts L.L.P.
2001 Ross Ave.
Dallas, Texas  75201

**Kay Standridge Kress**
Pepper Hamilton LLP
Suite 3600
100 Renaissance Center
Detroit, Michigan  48243

**Robert B. Millner**
Sonnenschein Nath & Rosenthal
Sears Tower, Suite 8000
233 South Wacker Drive
Chicago, Illinois  60606

## Recent Developments Affecting Chapter 11 Cases

"...If it is black-letter law that the terms of an unambiguous private contract must be enforced irrespective of the parties' subjective intent, see 11 R. Lord, Williston on Contracts § 30:4 (4[th] ed. 1999), it is all the clearer that a court should enforce a court order, a public governmental act, according to its unambiguous terms.  This is all the Bankruptcy Court did."

\*\*\*

"Those orders are not any the less preclusive because the attack is on the Bankruptcy Court's conformity with its subject-matter jurisdiction, for '[e]ven subject-matter jurisdiction ... may not be attacked collaterally.'  *Kontrick v. Ryan*, 540 U.S. 443, 455n.9 (2004)....So long as respondents or those in privity with them were parties to the Manville bankruptcy proceeding, and were given a fair chance to challenge the Bankruptcy Court's subject-matter jurisdiction, they cannot challenge it now by resisting enforcement of the 1986 Orders...."

\*\*\*

"The willingness of the Court of Appeals to entertain this sort of collateral attack cannot be squared with res judicata and the practical necessity served by that rule.  'It is just as important that there should be a place to end as that there should be a place to begin litigation,' *Stoll v. Gottlieb*, 305 U.S. 165, 172 (1938), and the need for finality forbids a court called upon to enforce a final order to 'tunnel back...for the purpose of reassessing prior jurisdiction de novo,' *In re Optical Technologies, Inc.* 425 F.3d 1294, 1308 (CA11 2005)...."

**_Travelers Indemnity Co. v. Bailey,_ 557 U.S. ___, 129 S. Ct. 2195, 2204, 2205, 2206 (2009) (Souter, J.) (7-2)(footnotes omitted).**

Prepared for Task Force on Current Developments of Business Bankruptcy Subcommittee of the Section of Business Law of the American Bar Association Spring  Meeting: April 2010

**Martin J. Bienenstock Dewey & LeBoeuf  LLP**

### iii.   Holding

The court adopted the debtors' expert's valuation, supplemented to omit any weighting of the dcf method.  It yielded a valuation range of $492 million to $692 million.

Only the debtors' expert provided a liquidation value analysis, and the court adopted its range of $113 million to $152 million.

### i.   Rationale

The court opined it had serious problems with the dcf method because the debtor's expert used projections assuming major capital expenditures of $1.5 billion, while DISH' expert used a stream of largely negative cash flows, which the court observed would mean the buyer would have a reason other than cash flow for buying the company.

The court found the Trading Comparables Analysis resulted in the most reliable valuation of the debtors' business because it was based on two companies with directly comparable assets operating in the same segment of the industry.  The experts also differed the least using this methodology.  The court sided with the debtors' expert's use of both the book values and market values "because the stock of the comparable companies was trading at a significant discount at the time of the valuation, and because of the uncertainty in the markets, it was prudent to weight the book and market value equally."  419 B.R. at 198.

The court found the Spectrum Transactions Analysis less reliable than the Trading Comparables Analysis.  To the extent it is considered, the court sided with the debtors' expert's analysis "because the relatively large range of values reached by Mr. Henkin [debtors' expert] was tempered by his low weighting of this method…"  419 B.R. at 198.  The court observed that DISH' expert's finding that there was only one comparable transaction necessitates placing less than a 40% weighting on that figure.

Using only the Trading Comparables Analysis and Spectrum Transactions Analysis, weighted 94.7% and 5.3%, the debtors' expert's range became $492 million to $692 million.  DISH' expert's new weighting would be 33.3% and 66.7%, yielding a range of $270 million to $340 million.

### ii.   Designation of DISH' Rejection of First Lien Treatment

The DBSD court designated DISH' rejection ballot in respect of the class of first lienholders based largely on *In re P-R Holding Corp.*, 147 F.2d 895 (2d Cir. 1945), and what it called the "*Allegheny* doctrine," alluding to *In re Allegheny*

*International, Inc.*, 118 B.R. 282 (Bankr. W.D. Pa. 1990). 421 B.R. at 138, 139-140.[81]

DBSD concentrated on the language in *P-R Holding* providing when a claim "purchase is in aid of an interest other than an interest of a creditor, such purchases *may* amount of 'bad faith...'" *P-R Holding*, 147 F.2d at 897 (emphasis supplied). *DBSD*, 421 B.R. at 138n.16. As explained below, *DBSD* appears to have erred, however, by (a) substituting "will" for "may" by concluding the motive to control is alone sufficient to designate a vote, and, as a result, (b) overlooking the fact that the Second Circuit only found bad faith due to the claims purchase creating discrimination against other creditors.

In *P-R Holding*, the appellate court explained the plan proponents' purchase of claims was in bad faith because "those purchases result in a discrimination in favor of the creditors selling their interests." *In re P-R Holding Corp.*, 147 F.2d 895, 897 (2d Cir. 1945). *P-R Holdings* did not determine the claims purchases were in bad faith simply because the purchaser wanted to acquire the debtor's property. Indeed, after finding the claims purchase was in bad faith, the court did not designate the purchased votes and ruled the purchaser's plan and acquisition of control should be confirmed. The facts in *P-R Holding* were that the plan provided for payment of one half the prepetition mortgage debt, 1/6 in cash and 2/6 in new 10-year mortgage debt at 4% interest. 147 F.2d at 896. The plan proponents who were funding the plan purchased claims for cash at 40% and 50% on the dollar because the claims had rejected the plan and they wanted to vote them to accept the plan. 147 F.2d at 896. Thus, the purchased claims received better treatment than the other claims would receive under the plan. ("We agree that the purchases by Bisgeier and Cohen resulted in an inequity among the creditors, since those who sold to Bisgeier and Cohen received 50 cents in cash, while the plan provided for payment of 50 cents on the dollar, partly in cash and largely in mortgage securities.... 147 F.2d at 897.). Notably, the appellate court ruled it would not disqualify or designate the votes purchased because the plan still represented the best offer available and was made somewhat more attractive by some concessions from the plan proponents. 147 F.2d at 898.

Thus, *P-R Holding* follows the black letter jurisprudence going back to *Young v Higbee Co., 324 U.S. 204 (1945),* finding bad faith when a party in interest treats some creditors better than others in the same class, *P-R Holding* adheres to the principle that purchasing claims to cause a plan to be accepted or rejected does not by itself warrant disqualification, 147 F.2d at 897, and also demonstrates that purchasing claims as part of a strategy to control the debtor's only asset is not bad faith as long as the purchases do not discriminate against

---

[81] *DBSD*, 421 B.R. at 134 ("...This is the paradigmatic case for the application of the Allegheny doctrine...").

creditors.[82]  In *DBSD*, DISH purchased all the claims in the first lien class at par. Thus, there was no discrimination there.  Moreover, DISH never did purchase a blocking position in the second lien debt.  Had it done so for a price not exceeding the amount DISH would offer other second lien debt holders in a plan, that also would not show *per se* bad faith even if DISH does want to control DBSD's business.

In *In re Allegheny International, Inc.*, 118 B.R. 282, 286 (Bankr. W.D. Pa. 1990), an entity called Japonica proposed a plan to acquire the reorganized debtor under which Japonica would purchase the shares issued under the plan for $6.42 per share, subject to holdbacks based on future resolutions of disputed claims.  The debtor's proposed plan offered $7 per share.  118 B.R. at 286.  To cause the debtor's plan to be rejected, Japonica purchased 33.87% of the claims in one class for prices ranging from 95% to 82% of face.  Japonica purchased less than 1/3 of the claims in another class for 66% of face and caused that class to reject as well.  118 B.R. at 287.  The debtor requested the designation of Japonica's votes pursuant to Bankruptcy Code section 1126(e) because the plan was not confirmable over those classes' rejections.  118 B.R. at 290.  Japonica purchased claims for $7 per share when it was offering those claims only $6.42 per share in its proposed plan.  118 B.R. at 294.  Additionally, Japonica launched a tender offer and thereby acquired 62% of the claim amount in one class and 36% in another.  118 B.R. at 295.  The tender offer expired while voting on Japonica's plan was in process and resulted in Japonica treating the purchased claims differently than claims were treated under the plan in that the purchased claims received immediate cash with no holdback.  118 B.R. at 295-296.  Japonica paid between 6% and 23% more to purchase certain claims than it offered under its proposed plan.  118 B.R. at 297.  Japonica revised its own proposed plan to increase the distribution to 94.86% to a class in which Japonica had purchased claims for 66% of their amounts.  The court wrote: "This is chutzpah with a vengeance.  It is also bad faith."  118 B.R. at 297.

The Allegheny court summed up Japonica's motive as follows: "Japonica's actions and statements make abundantly clear that it is 'control' and 'control profit' that they seek.  This control profit will not be shared through a reorganization plan with all creditors and all interest holders.  A control profit will be shared by only Japonica and their affiliates.  Japonica intends to use its newly acquired control to extract economic profit for itself, not to maximize the results for all creditors. *** Acquiring claims with the clear purpose of achieving control of the debtor, thereby earning a control profit, does not maximize the result for all creditors.  Such action manipulates the process."  118 B.R. at 299, 300.

---

[82] Section 1126(e) of the Bankruptcy Code has been interpreted this way for a considerable time. In *In re Gilbert*, 104 B.R. 206, 215-216 (Bankr. W.D. Mo. 1989), the court deployed the Supreme Court's definition of lack of good faith from *Young v. Higbee*, 324 U.S. 204 (1945), ruling: "...the purpose of the good faith provision was to prevent creditors from using 'obstructive tactics and holdup techniques' to secure wither some unfair advantage through the plan's acceptance or rejection, or perhaps preferential treatment for the price of their vote." (internal quotation from *Young v. Higbee*, 324 U.S. 204, 210-211 (1945)).

The foregoing observations of the *Allegheny* court together with the remedy it ordered, sheds much light on what a 'motive to acquire control' has to do with vote designation. In short, the *Allegheny* court made control available to Japonica in a manner that virtually guaranteed Japonica would obtain control for many reasons. The court ordered that Japonica had 45 days to show it had the ability to buy all the reorganized debtor's shares for $7 per share and warrants for $1.53 per warrant, and that if it did, the debtor and Japonica were to facilitate the purchase and an orderly change in control. 118 B.R. at 303. The court also ordered that if Japonica did not acquire control or sell its shares, then its shares would be held in trust by the reorganized debtor for 3 years. 118 B.R. at 303-304. Because Japonica was already a substantial shareholder, it would have been very negative for Japonica and for other shareholders to have a material portion of the company's stock in limbo for 3 years. Major capital transactions would be stymied by the inability of a major shareholder to vote its shares.

The court's remedy makes clear that the motive to acquire control is not *per se* evil or a ground to designate votes under section 1126(e). Rather, the policy to be served is to stop a claimholder from using its claims purchases and votes to prevent other claimholders from sharing in the 'control profit.' The *Allegheny* court made sure Japonica would pay the top end of what the court found was the share value. 118 B.R. at 305 ("The resultant values of the reorganization shares were $6.33 to $7 per share of the new common stock and zero to $1.53 for the warrants.").

*DBSD* espouses a principle it asserts it takes from *Allegheny*, but is actually unsubstantiated by *Allegheny* or any prior decision, namely that the motive to take control alone warrants the designation of votes: "Lastly, the purpose to acquire debt in this case, and to use voting to advance the effort to take control, is as plain in this case as it was in *Allegheny*....421 B.R. at 140. *DBSD* overlooks the absence of any fact showing that DISH caused itself to be favored, or different creditors in the same class to be treated differently, as Japonica did in *Allegheny*. Moreover, even if a motive to control, alone were actionable,[83] *DBSD* overlooks DISH' ultimate failure to buy a blocking or controlling position in the second lien debt, notwithstanding its documents showing one DISH employee wanted to do so.

While the lesson of *Allegheny* is that a creditor aiming to control the reorganized debtor must share the control profit or value ratably with other

---

[83] Some eminent commentators refer to control as a basis for bad faith, but explain that it is when an effort to control is linked to disparate treatment of creditors in the blocker's class that control becomes bad faith. Chaim J. Fortgang and Thomas Moers Mayer, *Developments in Trading Claims and Taking Control of Corporations in Chapter 11*, 13 Cardozo L. Rev. 1, 26-27n.122 (1991) ("'Based on the *Waco* case and Douglas' reactions to it, it also seems clear that a blocker cannot trade its position for control of the debtor unless it does so by having equity distributed ratably to all members in its class'") (quoting Fortgang & Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11*, 15 N.Y.U. Workshop on Bankruptcy and Business Reorganization 131 (1989)).

creditors if it uses the voting process to take control, *DBSD* (a) extracts from *Allegheny* its remarks about Japonica wanting control, while (b) overlooking *Allegheny's* methodical listing of all Japonica's actions designed to treat differently creditors in the same class and depriving many of them of the control profit Japonica would reap from being a creditor in such classes, and (c) overlooking that *Allegheny's* remedy was to facilitate Japonica's taking of control as long as it paid each creditor its ratable share of the control profit.

As a result, *DBSD* actually criticizes DISH for paying each first lien creditor the full amount of its claim, when that would prevent DISH from profiting at their expense and having them treated differently.  Obtaining top dollar for creditors and preventing unequal treatment is exactly what *Allegheny* attempted to accomplish, not discourage.  But, *DBSD* propounds the accusation that: "First, as the Court has found, and even more egregiously than *Allegheny* –where Japonica made it purchases at a maximum of 95[cent] on the dollar – DISH purchased *all* of the First Lien Debt *at par*, knowing that the Plan proposed replacing the First Lien Debt with an Amended Facility that DISH did not want...." 421 B.R. at 140 (emphasis supplied by court).  What *DBSD* points to as "egregious," is exactly what Allegheny and all other courts want to foster, namely maximum and equal payment to all claimholders in the class.  *DBSD* overlooks that *Allegheny* highlighted Japonica's purchase of certain debt for 95 cents on the dollar, because Japonica paid other debt in the same class only 82 cents on the dollar, *Allegheny*, 118 B.R. at 287, not because *Allegheny* was against creditors being treated well or because Japonica wanted to purchase control.  It was the uneven manner in which Japonica proceeded that *Allegheny* highlights.

*DBSD's* premise that a motive to control is alone a wrongful motive, also caused it to regard as a strike against DISH that DISH requested permission to propose a chapter 11 plan after having earlier asserted it was not proposing a plan.[84]  Clearly, creditors cannot maximize their returns when there is no competition to acquire the reorganized debtor.  *Allegheny* used the competition to maximize creditors' returns, while *DBSD* leaves the second lienholders with stock in a reorganized debtor lacking committed funding for the last two years before it projects revenues, and no competing bidders.  Notably, the filing of a competing plan cannot be bad for a debtor's constituents because (a) the court is the final arbiter as to whether to confirm the debtor's plan or the investor's plan after considering creditor and shareholder preferences,[85] and (b) the investor's plan must satisfy all the same requirements as the debtor's plan including the requirement that it must be proposed in good faith.[86]

---

[84] *DBSD*, 421 B.R. at 141 ("But the Court cannot agree that DISH has acted as a "model citizen," or that by not engaging in the acts it mentioned, DISH should be immune from application of the *Allegheny* doctrine. That is especially true here, since within days of saying what it said in its pleading, DISH *did* seek to terminate exclusivity, to propose a competing plan.").
[85] Bankruptcy Code section 1129(c).
[86] Bankruptcy Code section 1129(a)(3).

*DBSD* also treats negatively that a potential acquirer such as DISH has a "strategic investment interest," and not just a motive to maximize its recovery on a claim.[87]  Why?  Whether a claims purchaser purchases the claim because it believes the market undervalues it, or because it believes it can cause the debtor to engage in activities more profitable than its current business plan, the claims purchaser is trying to make a profit.  There is no explanation in *DBSD* or any other decision on vote designation as to why a strategic investment interest makes a difference unless the voter is attempting to kill its competition.  The jurisprudence cited above consistently looks to whether the entity voting a claim either treated other creditors differently, or committed some type of tort such as blackmail.[88]

Accordingly, while *DBSD* asserts it is applying the "*Allegheny* doctrine," 421 B.R. at 139, it is actually excising the portion of *Allegheny* that explains Japonica was attempting to gain control, from the balance of *Allegheny* showing it was Japonica's acts to treat creditors in the same class differently and to deprive them of the control profit that Japonica would obtain as a creditor in numerous classes, that were the wrongful acts.  *Allegheny* simply applies prior law designating votes when the claimant is creating unequal treatment of creditors in the same class and favoring itself.  In fact, a computer search shows no other court has ever referred to the "*Allegheny* doctrine," most likely because *Allegheny* does not create a new doctrine designating votes solely because a creditor seeks control; rather it adheres to the jurisprudence designating votes of a creditor attempting to attain ownership and control by attempting to have creditors in the same class treated differently with the acquiring creditor treated the best.

*DBSD* also dismisses the fact that the holders of first lien debt who sold their claims to DISH would, like DISH, likely have objected to and rejected the plan's treatment.  421 B.R. at 140.  As explained above, there would be no interest or principal payments for 4 years, and the note would lose some collateral, covenants, and cross defaults.  Indeed, what claimholder would not reject a plan proposing a nonperforming 4-year note from a startup operation uncertain to have sufficient funds for 4 years of operations?  Based on *DBSD*, claims purchasers have to worry they lose their rights to vote and to oppose cramdown treatment if they pay 100 cents for a claim.  That frustrates the public policy to try to maximize creditor recoveries and minimize their losses.[89]

---

[87] *DBSD*, 421 B.R. at 141-142 ("Here, by contrast, DISH has acted to advance strategic investment interests wholly apart from maximizing recoveries on a long position in debt it holds.").
[88] *See* footnotes 66-68, *supra*.
[89] *Grayson-Robinson Stores, Inc. v. SEC*, 320 F.2d 940,949 (2d Cir. 1963)(decision on whether reorganization should proceed under Chapter X or Chapter XI) ("The prime objective of the Bankruptcy Act remains the simple one of getting creditors paid, and people engaged in trade are still the best judges of their own self-interest in that regard.").

# EXHIBIT B

Martin N. Flics
Paul S. Hessler
**LINKLATERS LLP**
1345 Avenue of the Americas
New York, NY 10105
(+1) 212 903 9000 (Tel)
(+1) 212 903 9100 (Fax)

*Attorneys For DISH Network Corporation*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re*<br><br>DBSB NORTH AMERICA, INC., *et al.*,<br><br>                              Debtors. | Chapter 11<br><br>Jointly Administered<br><br>Case No. 09-13061 (REG) |
| DISH NETWORK CORPORATION,<br><br>                              Appellant,<br><br>                    v.<br><br>DBSD NORTH AMERICA, INC., *et al.*,<br><br>                              Appellees. | <br><br><br><br>09 Civ. 10372 (LAK),<br>09 Civ. 10373 (LAK) |

                                                                  x

**ORDER REQUIRING PRIOR NOTICE OF EFFECTIVE DATE**

        Upon a Motion of DISH Network Corporation ("DISH") (Docket No. __ ) (the

"Motion") and upon consideration of the papers filed in connection therewith, this Court finds

and concludes that the legal and factual bases set forth in the Motion establish just cause for the

relief requested therein; notice of the Motion was sufficient, and no other or further notice need

be provided; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that:

A11938534/0.3/16 Apr 2010

1.      Upon the Debtors having obtained all authorizations, consents, and regulatory approvals from the Federal Communication Commission (the "FCC") required in connection with the transfer, change of control, or assignment of FCC licenses ("FCC Approval") as contemplated in their plan of reorganization (the "Plan"), or upon the waiving of FCC Approval as a condition precedent to the consummation of the Plan, the Debtors shall provide at least 14 calendar days' written notice ("Notice") to any party ("Appellant") that has timely filed a notice of appeal of the District Court Order (as defined in the Motion) before taking any further action to consummate the Plan.

2.      Upon the consent of each Appellant, as applicable, or the giving of Notice and the expiration of the 14-day period, the Debtors may proceed to consummate the Plan.

3.      Notwithstanding the foregoing, the Debtors shall not be required to give Notice to an Appellant in the event that all appeals filed by the respective Appellant have been resolved by final order(s) not subject to further appeal or review.

4.      This Order is without prejudice to either (a) the right of any Appellant to seek a stay or other relief pending appeal of the District Court Order from this Court or any other court with jurisdiction to provide such relief or (b) the right of any party in interest to object to any stay request or request for other relief by any Appellant, including with regard to a supersedeas bond.

5.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:      New York, New York
            _____, 2010

_____
Hon. Lewis A. Kaplan
United States District Judge